**MANCORP, INC., Petitioner,**

**v.**

**John C. CULPEPPER, Jr. and Culpepper Properties, Inc., Respondents.**

**No. C-9515.**

Supreme Court of Texas.

Dec. 12, 1990.

R. Scott Hogarty, James W. Paulsen, and Bill Jones, Houston, for petitioner.

James L. Wright, and Eva C. Ramos, Austin, for respondents.

OPINION

SPEARS, Justice.

Mancorp, Inc. sued John C. Culpepper, Jr. and Culpepper Properties, Inc. for breach of a construction contract. Mancorp alleged that it had performed the contract by completing work on the First Bank Galleria building in Bryan, Texas, and that it was owed $510,650, the unpaid balance under the contract. Culpepper and Culpepper Properties, Inc. counterclaimed for breach of contract, breach of warranty, and deceptive trade practices, alleging material defects in the building. The jury found (1) that Mancorp substantially performed its contract with Culpepper Properties, Inc., (2) that Culpepper Properties, Inc. was entitled to an offset for necessary repairs to the building totalling $289,376.90, (3) that Culpepper Properties, Inc. was the alter ego of John C. Culpepper, Jr., (4) that Mancorp was not in breach of its contract with Culpepper Properties, Inc., and (5) that Mancorp was entitled to reasonable and necessary attorneys' fees. Culpepper and Culpepper Properties, Inc. moved for judgment non obstante veredicto on the jury's alter ego finding. The trial court rendered judgment for Mancorp in the amount of $221,273.10 (contract price less the offset) but rendered judgment n.o.v. for Culpepper on the alter ego finding. The court of appeals reformed the trial court's judgment by reducing Mancorp's recovery by $2000, and affirmed the judgment as reformed. 781 S.W.2d 618. We reverse the judgment of the court of appeals and remand this cause to that court for consideration of the factual insufficiency point that Culpepper raised in the appeal below.

## *ALTER EGO*

In order to uphold a trial court's judgment notwithstanding the verdict, an appellate court must determine that no evidence supports the jury's findings. *Williams v. Bennett*, 610 S.W.2d 144, 145 (Tex.1980). When reviewing a no evidence point, an appellate court is limited to reviewing only the evidence tending to support the jury's verdict and must disregard all evidence to the contrary. *Sherman v.*

*First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988) (per curiam); *Garcia v. Insurance Co. of Pa.*, 751 S.W.2d 857, 858 (Tex. 1988) (per curiam). If more than a scintilla of evidence supports the jury finding, it must be upheld. *Garcia*, 751 S.W.2d at 858. Thus, appellate courts must consider the evidence and inferences as they tend to support *the verdict* and not with a view toward supporting *the judgment*. *See, id.* ("If there is more than a scintilla of evidence to support the *jury finding*, it must be upheld.") (emphasis added). With this standard in mind, we now examine the evidence to determine whether the jury's alter ego finding is supported by more than a scintilla of evidence.

Under the alter ego theory, courts disregard the corporate entity when there exists such unity between corporation and individual that the corporation ceases to be separate and when holding only the corporation liable would promote injustice. *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex.1986). An alter ego relationship may be shown from the *total* dealings of the corporation and the individual. *Id.* This showing may include evidence of "the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Id.*

In the instant case, the court of appeals found that the only testimony concerning alter ego was that of Culpepper. His testimony showed noncompliance with corporate formalities and payment of alleged corporate debts with his personal checks. The court of appeals viewed this testimony standing alone, and the reasonable inferences drawn from it, as constituting no evidence that Culpepper Properties, Inc. is Culpepper's alter ego. The court also considered evidence of checks drawn on the account of "John C. Culpepper, Jr., Bank Tower Project," which Culpepper wrote without a designation that he was the agent of Culpepper Properties, Inc., to be no evidence of alter ego and further stated that Culpepper's business card—"Culpepper Properties, Inc., John C. Culpepper, Jr., his self"—amounted to less than a scintilla of evidence. Finally, the court could find no evidence of gross fraud that would result in injustice.

Instead of considering this evidence and the reasonable inferences supporting the jury's finding of alter ego, the court of appeals drew inferences from the evidence which tended to support the trial court's judgment n.o.v. that Culpepper Properties, Inc. was *not* the alter ego of Culpepper. Certainly, reasonable minds could differ about whether Culpepper's testimony established that Culpepper failed to observe corporate formalities. However, it was not unreasonable for the jury to infer from Culpepper's testimony that he and the corporation were alter egos. The evidence of the checks could support an inference that the account was used solely for Culpepper's personal business investments. Similarly, evidence of Culpepper's business card may have led the jury to infer that Culpepper considered Culpepper Properties, Inc. indistinguishable from himself.

These pieces of evidence, however, do not stand alone; we consider them along with other pieces of evidence. There was testimony that throughout their dealings Culpepper led Mancorp to believe it was dealing with Culpepper as an individual. During negotiations, Culpepper told Mancorp's vice president that he personally backed the First Bank Galleria project. All of these pieces of evidence, *taken together* and in light of other evidence in the record showing Culpepper's and Culpepper Properties, Inc.'s total dealings,[1] constitute more than a scintilla of evidence to support a finding that there is such unity between the corporation and the individual that the separateness of the corporation has ceased. *See Castleberry*, 721 S.W.2d at 276.

1. The dissenting opinion in the court of appeals sets forth a summary of other evidence relevant to alter ego. 781 S.W.2d at 629–30. This list catalogues some of the total dealings between Culpepper and Culpepper Properties, Inc.

Likewise, there is more than a scintilla of evidence that failure to pierce the corporate veil will result in injustice. *See Matthews Constr. Co. v. Houston Pipe & Supply Co.,* 796 S.W.2d 692, 693 (Tex.1990) (when corporate form is used as essentially unfair device courts may act in equity and disregard corporate form to avoid inequitable result). "Where a corporate entity is owned or controlled by an individual who operates the company in a manner indistinguishable from his personal affairs and in a manner calculated to mislead those dealing with him to their detriment," the corporate fiction may be disregarded in order to prevent injustice. *See Loomis Land & Cattle Co. v. Wood,* 699 S.W.2d 594, 597 (Tex.App.—Texarkana 1985, writ ref'd n.r.e.); *see also Sagebrush Sales Co. v. Strauss,* 605 S.W.2d 857 (Tex.1980). In contract cases, inequity frequently results from reasonable reliance on the financial backing of the corporation's owners should the corporation become insolvent. *Pan Eastern Exploration Co. v. Hufo Oils,* 855 F.2d 1106, 1133 (5th Cir.1988).[2] Without this reliance on an owner's representations of financial backing, a contract claimant would otherwise assume the risk of insolvency as part of its bargain with the corporate entity. *Id.* (citing *Bell Oil & Gas Co. v. Allied Chem. Corp.,* 431 S.W.2d 336 (Tex.1968); *Edwards Co. v. Monogram Indus., Inc.,* 730 F.2d 977 (5th Cir.1984) (en banc)).

Viewing the evidence in the light most favorable to the jury's verdict, the evidence in this case tends to show the following: (1) Ryan Mortgage Company made the construction loan for the First Bank Galleria project to Culpepper Properties, Inc. and Culpepper individually; (2) Culpepper personally guaranteed the loan; (3) Culpepper told Richard Darrah, Mancorp's vice president, that he was personally behind the project; (4) Ryan Mortgage confirmed to Darrah that Culpepper was personally behind the project; (5) Culpepper did business under the corporate name of Culpepper Properties, Inc. and personally under the name Culpepper Properties; (6) Mancorp submitted the proposal for the bank project to "Culpepper Properties," not Culpepper Properties, Inc.; (7) Culpepper signed an order for changes in the construction documents personally under the name of Culpepper Properties; and (8) Mancorp thought it was doing business with Culpepper, the individual, and that he was paying for the job. The record also shows that Ryan Mortgage foreclosed on the project and that two of the project's creditors went unpaid. Based on this evidence, a jury could reasonably infer that injustice would result if Culpepper was not held personally liable because Mancorp relied on Culpepper's misleading representations to the effect that he was backing the project. Moreover, the evidence of the mortgage company's foreclosure of the project and the fact that two of the project's creditors were unpaid could have led the jury to reasonably infer that Mancorp might go unpaid by Culpepper Properties, Inc., and this would result in injustice.[3] Therefore,

2. The Fifth Circuit, in interpreting *Castleberry,* stated that the doctrine of alter ego liability does not hinge solely on the rationale of promoting reciprocal fairness:

> [T]he rule is also designed to give incentives to those using the corporate form to obey the state's laws fully by maintaining corporate formalities, and thus legal separateness, of the corporation. Persons who fail to maintain full corporate formalities cannot expect the state to grant them the limited liability that flows from the corporate form. The person invoking alter ego proper against a corporation, whether claiming in contract or tort, thus may be the recipient of a windfall. In theory, even if the corporation was adequately capitalized and even if the claimant did not rely on the financial backing of the corporation's owners, the claimant is still entitled to recover as a sort of private attorney general. Of course, the different species of corporate disregard seldom occur in pure form, so alter ego usually will be accompanied by assertions of unfairness to the claimant.

*Pan Eastern,* 855 F.2d at 1132; *see also Gibraltar Sav. v. LDBrinkman Corp.,* 860 F.2d 1275, 1288 (5th Cir.1988).

3. Question number four submitted to the jury asked whether Culpepper Properties, Inc. was Culpepper's alter ego. The jury was instructed that "the corporation is the alter ego of an individual when there is such unity between the corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." The jury answered "Yes."

based upon the evidence concerning the total dealings between Culpepper and Culpepper Properties, Inc., we hold that more than a scintilla of evidence supports the jury's alter ego finding and the court of appeals erred in concluding otherwise.

*DESIGNATION OF WITNESSES*

By conditional application, Culpepper and Culpepper Properties, Inc. assert that Mancorp engaged in a calculated scheme of deception and surprise during discovery. This scheme, it is argued, resulted in the surprise testimony of Mancorp's expert witness—David Othold of Stewart Construction Consultants. Culpepper contends that Mancorp engaged in a trial by ambush and that Othold's testimony caused the rendition of an improper judgment.

According to Culpepper, the trial court should have excluded Othold's testimony because Mancorp failed to timely supplement its answers to Culpepper Properties, Inc.'s interrogatories and to timely designate its witnesses to include Othold. The thrust of Culpepper's argument is that Mancorp did not show good cause for its failure to supplement until after the trial court's discovery deadline. *See* Tex.R. Civ.P. 166b(6), 215(5). The trial court, however, found that good cause existed, and the court of appeals held that the trial court did not abuse its discretion in so finding. We do not reach the merits of this question because, even if good cause is lacking, Culpepper cannot meet its appellate burden.

Culpepper has failed to show how Othold's testimony, even if improperly admitted, was calculated to cause and probably did cause the rendition of an improper judgment in the case. *See Boothe v. Hauser,* 766 S.W.2d 788, 789 (Tex.1989); Tex.R. App.P. 81(b). When erroneously admitted evidence is merely cumulative or does not concern a material issue dispositive of the case, the error is harmless. *Boothe,* 766 S.W.2d at 789; *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). Harmfulness is determined by looking at the entire record to see whether the judgment was controlled by the testimony that should have been excluded. *McKinney v. National Union Fire Ins. Co.,* 772 S.W.2d 72, 75 (Tex.1989); *Gee,* 765 S.W.2d at 396.

Othold's testimony primarily concerned the specific question of whether Mancorp substantially completed the project. Mancorp presented other sufficient evidence besides Othold's testimony, which included the testimony of six expert witnesses in building construction. The other witnesses also testified that the building was substantially and fully completed on time. We therefore hold that no harmful error was committed in admitting Othold's testimony because his testimony was entirely cumulative.

*ATTORNEYS' FEES*

On appeal below, Culpepper urged the court to offset the trial court's judgment by an additional $2000 because Mancorp allegedly breached its express warranty that its work would be of good quality and free of defects, in violation of the Deceptive Trade Practices—Consumer Protection Act (DTPA). The trial court, however, refused to submit any questions to the jury regarding breach of warranty and DTPA liability. The court of appeals held that the trial court did not err in refusing to submit the questions, but that the jury nevertheless had found that Mancorp breached its express warranty of good workmanship and, therefore, reformed the trial court's judgment to reflect an additional offset of $2000 pursuant to section 17.50(b)(1) of the DTPA. Culpepper complains here that the court of appeals erred by not reforming the judgment to reflect a further offset for attorneys' fees authorized by the DTPA. Tex.Bus. & Com.Code Ann. § 17.50(d) (Vernon 1987).

We do not need to reach this argument because Culpepper did not receive an award for actual damages required under the DTPA as a prerequisite to attorneys' fees. *Leyendecker & Assocs. v. Wechter,* 683 S.W.2d 369, 374 (Tex.1984). The trial court did not permit any DTPA or breach of warranty questions to go to the jury. Thus, there were no jury findings to sup-

port any damages under the DTPA or any other cause of action alleged. In fact, the jury refused to find that Culpepper sustained any damages.[4]

The court of appeals apparently interpreted the jury's finding of $289,376.90 worth of faults or defects in the First Bank Galleria building to be the legal equivalent of an award for actual DTPA damages.[5] They are not the same. Under well-established construction contract law, a building contractor who substantially performs is entitled to recover the full contract price less the cost of remedying those defects that are remediable, and less the reduction in value caused by defects that are not remediable. *E.g., Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 481 (Tex.1984); Guittard, *Building Contracts: Damages and Restitution,* 32 Tex.B.J. 91, 122 (1969). Thus, the cost of remedying any defects goes to the measure of *Mancorp's* breach of contract damages, not *Culpepper's* alleged DTPA damages. Culpepper was required to obtain a jury finding on its actual damages under the DTPA [6] and it cannot now transform the jury's finding of an offset for remediable damages into actual damages under the DTPA.

We reverse the judgment of the court of appeals and remand this cause to that court for consideration of the factual insufficiency point that Culpepper raised by cross-point in the appeal below.

HECHT, J., dissents, joined by PHILLIPS, C.J.

HECHT, Justice, dissenting.

I dissent. There is no evidence in this record from which the jury could have found that John C. Culpepper, Jr. was the alter ego of Culpepper Properties, Inc. The trial court reached this conclusion and rendered judgment notwithstanding the verdict for John Culpepper. The court of appeals reached the same conclusion and affirmed this portion of the trial court's judgment. Now this Court concludes that there is evidence of alter ego. The Court cannot point to a shred of evidence which, by itself, implies that John Culpepper was the alter ego of Culpepper Properties. Instead, it takes various bits and pieces of evidence, each of which is no evidence of alter ego, adds them together, notes that Mancorp *thought* John Culpepper might be Culpepper Properties' alter ego, and comes up with evidence of alter ego. Nothing plus nothing plus nothing is still nothing,

4. The jury questions were as follows:

QUESTION NO. 5

Do you find that Mancorp, Inc. breached its contract with Culpepper Properties, Inc.?
ANSWER "YES" OR "NO."
ANSWER: NO
If you have answered Question No. 5 "Yes," and only in that event, then answer Question No. 6.

QUESTION NO. 6

Was such breach of contract a proximate cause of damages to Culpepper Properties, Inc.?
ANSWER "YES" OR "NO."
ANSWER: ___

5. The jury was asked:

QUESTION NO. 2

Do you find that Mancorp, Inc. substantially performed its building construction contract with Culpepper Properties, Inc.?
DEFINITION: "Substantially performed" means the contractor must have, in good faith, intended to comply with the contract, and shall have substantially done so in the sense that the defects are not outside of the terms of the contract and do not constitute a deviation from the general plan contemplated for the work, and are not so essential that the object of the parties in making the contract and its purpose cannot without difficulty be accomplished by remedying them. Such performance permits only such omissions or deviations from the contract as are inadvertent and unintentional, are not due to bad faith, do not impair the structure as a whole, and are remediable without doing material damage to other parts of the building in tearing down and reconstructing.
ANSWER "YES" OR "NO."
ANSWER: YES
If you have answered Question No. 2 "Yes," and only in that event, then answer Question No. 3.

QUESTION NO. 3

Find the reasonable cost of remedying the defects or omissions, if any, in such a way as to make the building conform to the contract.
ANSWER IN DOLLAR AND CENTS, IF ANY.
ANSWER: $289,376.90

6. Although Culpepper alleged in the court of appeals that the trial court erred in failing to submit its DTPA question to the jury, it does not complain here that the omission of the jury question was error.

no matter how hard you believe, or hope, that it may be something.

The Court states that to prove that a corporation is merely the alter ego of a person, one must show two things: first, that "there exists such unity between corporation and individual that the corporation ceases to be separate", and second, that "holding only the corporation liable would promote injustice." *Supra* at 228. Alter ego, the Court acknowledges, "is shown from the *total* dealings of the corporation and the individual". *Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex.1986) (emphasis added). The Court, however, does not review the total dealings between John Culpepper and Culpepper Properties; rather, it looks only to those dealings which support a finding of alter ego. This restricted review of the evidence is justified, the Court says, because legal sufficiency of the evidence must be determined by considering only the evidence and inferences favorable to the jury finding.[1] Even under this restricted view, there is no evidence to support a finding of alter ego in this case.

Regarding the first showing required to prove alter ego, the Court holds that the following evidence is enough for the jury to find that there was such unity between John Culpepper and Culpepper Properties that the corporation ceased to be separate: Culpepper Properties did not observe all corporate formalities; John Culpepper paid

1. The Court does not appear to notice the inherent inconsistency between the test for alter ego and its limited evidentiary review. In *Castleberry* the Court held that it was error to instruct the jury that it could find alter ego from "one or more" factors. 721 S.W.2d at 276. "[A] proper alter ego instruction should include all the relevant factors and consider the total dealings of the corporation and the individual." *Id.* If a jury must consider the total dealings between a corporation and an individual before it can find alter ego, it is hardly appropriate to review the propriety of an affirmative finding by looking only to those dealings which might imply alter ego.

The Court has previously encountered this same difficulty in reviewing findings of gross negligence. In *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981), the Court stated:

> In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look to all of the surrounding facts, circumstances, and conditions, not just individual elements or facts.... At first glance there may appear to be some conflict in utilizing the traditional no evidence test and considering all the facts and circumstances to determine gross negligence.

Having noticed the inconsistency in using the no-evidence standard to review a finding which can be made only upon the totality of circumstances, the Court failed to resolve it. The concurring opinion suggested that the Court did not apply the traditional no-evidence review standard, despite language to the contrary in its opinion:

> A part of the "traditional no evidence test" is that this Court disregards all evidence unfavorable to the jury's answers. The Court's opinion, it seems to me, consciously removes that part of the "traditional" test and moves down to another; i.e., that [all] the evidence must be viewed in the light most favorable to the jury's verdict.

*Id.* at 926 (Greenhill, C.J., concurring). The dissenting opinion, however, argued that the inconsistency had not been resolved, implicitly or explicitly:

> It is held that the reviewing court should apply the "no evidence" test. Such review would require the reviewing court to consider only the evidence when viewed in its most favorable light that tends to support a jury finding of gross negligence *and to disregard all evidence of care.* This results in an abandonment of the long settled definition of "gross negligence." It is fundamental that in applying the no evidence test, the reviewing court would not look at the totality of the evidence....
>
> ... The Court's opinion leaves us with a definition of gross negligence that is called an "entire want of care," but evidence of care by the defendant becomes irrelevant to determine if gross negligence has been established. If, on review, we disregard all evidence of care, we are clearly permitting recovery for less than an entire want of care.

*Id.* at 927–928 (McGee, J., dissenting). This inconsistency ought to be resolved. *See City of Gladewater v. Pike,* 727 S.W.2d 514, 525 (Tex. 1987) (Kilgarlin, J., concurring). It certainly should not be extended to another area of law, the appellate review of alter ego findings.

The legal sufficiency of evidence to support an alter ego finding should be determined by reviewing all the evidence, not just the favorable evidence and inferences, in the light most favorable to the finding. Chief Justice Greenhill suggested that this is the test actually applied in reviewing gross negligence findings. 616 S.W.2d at 926–927. If that test were applied in this case, if the evidence supporting the alter ego finding were viewed in the context of all the dealings between John Culpepper and Culpepper Properties, the legal insufficiency of that evidence would be virtually inescapable.

some Culpepper Properties' bills by checks drawn on his personal account; John Culpepper's business card read "Culpepper Properties, Inc., John C. Culpepper, Jr., his self"; John Culpepper told Mancorp's representative that he was personally behind the project Culpepper Properties was working on; and "other evidence in the record". *Supra* at 228.

The evidence regarding Culpepper Properties' observance of corporate formalities is not entirely clear. Even if it were, a corporation's failure to observe corporate formalities is not alone enough to imply alter ego, especially when the corporation is closely held. *Torregrossa v. Szelc*, 603 S.W.2d 803, 804 (Tex.1980); *see Castleberry*, 721 S.W.2d at 272, 276. Indeed, observance of corporate formalities is now by statute not even a factor to be considered in determining alter ego. TEX.BUS. CORP.ACT §§ 2.21(A)(3),[2] 12.37(F).[3] John Culpepper testified without contradiction that Culpepper Properties was a closely held corporation.

The evidence regarding whether John Culpepper actually paid Culpepper Properties' obligations with personal funds is likewise far from clear. The evidence is that some of Mancorp's invoices to Culpepper Properties were paid with checks imprinted on the top left corner with "John C. Culpepper, Jr.," and below that in smaller print, "Bank Tower Project." The checks were signed by John C. Culpepper, Jr. without any designation of his corporate capacity. Assuming that this is evidence that John Culpepper used his personal funds to pay the corporation's bills, that fact in no way suggests that he and the corporation had ceased to be separate. Perhaps if the payments had run the other way, if Culpepper Properties had paid John Culpepper's personal bills, or perhaps if the two of them had commingled their funds, one might infer alter ego. But there is no evidence whatever of either of these hypotheticals. It is certainly an odd rule that the Court employs to reward the principal in a corporation who chose to pay some of its bills out of his own pocket by making him personally liable for all of its obligations.

John Culpepper's plainly facetious business card is at very best ambiguous. Moreover, there is no evidence that Mancorp ever saw John Culpepper's business card before the day of trial when it was offered in evidence. By suggesting that the solecism, "his self", implies that John Culpepper and Culpepper Properties are one and the same, the Court shows how far it is willing to grope for evidence of alter ego. Assuming the very most, that the business card actually states that John Culpepper and Culpepper Properties were the

2. "A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted shall be under no obligation to the corporation or to its obligees with respect to:

. . . . .

"(3) any contractual obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including without limitation: (a) the failure to comply with any requirement of this Act or of the articles of incorporation or bylaws of the corporation; or (b) the failure to observe any requirement prescribed by this Act or by the articles of incorporation or bylaws for acts to be taken by the corporation, its board of directors, or its shareholders."

This statutory provision did not become effective until August 28, 1989, after the trial in this case. *See* 1989 Tex.Gen.Laws 3610, 3617, 3664.

3. **"Lack of Formalities; Treatment as Partnership.** Neither the failure of a close corporation to observe usual formalities or requirements prescribed for an ordinary corporation by this Act relating to the exercise of corporate powers or the management of a corporation's business and affairs nor the performance of a shareholders' agreement that treats the close corporation as if it were a partnership or in a manner that otherwise is appropriate only among partners:

"(1) shall be a factor in determining whether to impose personal liability on the shareholders for the close corporation's obligations by disregarding the separate entity of the close corporation or otherwise;

"(2) is grounds for invalidating an otherwise valid shareholders agreement; or

"(3) shall affect the status of the close corporation under this Act or in law."

This statute does not preclude consideration of Culpepper Properties' failure to observe corporate formalities in this case because, although the undisputed testimony is that Culpepper Properties is a close corporation, the record does not establish that it was a close corporation formed under the Texas Close Corporations Law, Part 12 of the Texas Business Corporation Act, which includes this provision.

same, it is evidence only of what John Culpepper thought, and not of how he and the corporation dealt with one another.

Mancorp's assertion that John Culpepper stated that he was "behind the project" Culpepper Properties was developing was certainly true. John Culpepper had, at the lender's request, personally guaranteed the construction loan. He was personally involved in the work on the project at every stage. One could hardly assume from this statement, however, that John Culpepper treated Culpepper Properties as his alter ego. Mancorp was fully aware of the distinction between the two because its contract was with Culpepper Properties, Inc., and was signed by John Culpepper as president.

As if to concede the weakness of this evidence even taken altogether, the Court says simply that there is "other evidence in the record" to support a finding of alter ego. What this "other evidence" is is not entirely clear, only that it may be found in the dissenting opinion in the court of appeals. The Court has obviously mentioned specifically the evidence it finds most helpful and sought to bolster its conclusion with a general reference to the entire record. If there is other evidence on which the Court relies, it ought to point it out so that its opinion will state what evidence is enough to support a finding of alter ego. It does not choose to do so.

All this aside, however, and assuming that one could reasonably infer from the evidence in this record that John Culpepper did not treat Culpepper Properties as a separate entity, there is absolutely no evidence of the second showing required to prove alter ego, that holding only the corporation liable to Mancorp will promote injustice. The Court states that it is unjust not to hold John Culpepper personally liable to Mancorp because he guaranteed the construction loan and stated that he was behind the project. Why the construction lender's obtaining a personal guaranty when it requested one makes it unjust for Mancorp not to have one when it did not ask for one is inexplicable. That the Court finds it unjust for Mancorp not to collect from John Culpepper, with whom it did not contract, a debt owed by Culpepper Properties, with whom it did contract, simply because John Culpepper and Culpepper Properties were both in business, is somewhat disturbing. Far more disconcerting, however, is the Court's conclusion that *justice*, of all things, requires John Culpepper to pay Mancorp because "Mancorp thought it was doing business with Culpepper, the individual, and that he was paying for the job." How Mancorp's unilateral, subjective belief, not induced by John Culpepper, makes its claim more *just* than his is unfathomable.

The Court notes that the construction lender foreclosed on the project while trial was pending and that two other creditors went unpaid, for no specified reason. *Supra* at 229. Apparently, the Court means to suggest that if John Culpepper does not pay Mancorp himself, Mancorp will not be paid. Even if this were enough to show injustice, there is no evidence that it is true. At most, the evidence suggests that Culpepper Properties did not pay some of its bills. There is no evidence that it was incapable of paying Mancorp's applications for payment. To the contrary, Mancorp has argued that the evidence establishes that Culpepper Properties had the funds to pay its claims at one time.

I agree with the Court that the dealings between John Culpepper and Culpepper Properties must be viewed in their totality, although the Court takes a much narrower perspective of the record here. Nevertheless, even if the evidence cited by the Court were all there was in this record on the issue of alter ego, it would not allow alter ego to be inferred. I agree that weak inferences, no one of which is alone enough to support a finding of alter ego, may together do so. But pieces of evidence from which nothing can be inferred cannot be combined somehow to produce an implication. That is the situation here. The jury could reasonably have *suspected* that John Culpepper treated Culpepper Properties as his alter ego, as I believe the Court does, but it could not have *inferred* alter ego from this record. Several smoldering sticks, no one of them flaming, may togeth-

er build a fire. But all the sticks there are, piled up without spark or heat, make neither smoke nor fire; they are nothing but a big pile of sticks, and one cannot infer from the pile that they must be afire. If the shield from personal liability which the corporate form affords shareholders can be overcome by sheer volume of evidence bereft of substance, that shield is very little protection.

On remand, the court of appeals is left to determine whether the evidence of alter ego, of which it found none at all before, is factually insufficient to support the verdict. If that court is consistent with its prior opinion, it will remand this case for a new trial on the issue of alter ego. Because I would affirm the judgment of the court of appeals, I dissent.

PHILLIPS, C.J., joins in this dissenting opinion.